**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-4150

———

UNITED STATES OF AMERICA

v.

ERICK COLEMAN,
                                    Appellant

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 1-08-cr-00107-001)
District Judge:  Honorable Gregory M. Sleet

———

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 4, 2010

Before: AMBRO, CHAGARES, and VAN ANTWERPEN, <u>Circuit Judges</u>.

(Filed: June 7, 2010)

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

Erick Coleman ("Coleman") was convicted of possession of a firearm by a

convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(e).  Two patrolmen retrieved

a firearm from Coleman's person after they stopped him and subjected him to a pat down.

Coleman appeals the District Court's denial of his motion to suppress the evidence, arguing the patrolmen did not have a reasonable suspicion to stop him based on an anonymous tip. Because we conclude the patrolmen stopped Coleman based on a reasonable, articulable suspicion that Coleman was carrying an illegal weapon, we will affirm.

## I.

Because we write solely for the parties, we offer only those facts relevant to this opinion.

The parties do not dispute the essential facts found by the District Court based on Patrolman Officer Wilkers's ("Wilkers") testimony offered at the evidentiary hearing related to this motion.[1] Wilkers testified that on July 1, 2008, at approximately 1:00 a.m., he and Patrolman Miller ("Miller") were conducting a traffic stop at the corner of Maple and Clayton Streets in Wilmington, Delaware. They were both wearing police uniforms and driving a marked police car.

While conducting the stop, they received a radio dispatch requesting any available units to respond to the intersection of West Third and North Clayton Streets, three to four blocks away from where they were conducting the stop. The dispatcher relayed, based on an anonymous tip, that a black male wearing a black t-shirt and a New York Yankees

---

[1] The United States called Wilkers to testify at the evidentiary hearing for this motion to suppress. Coleman did not call any witnesses.

baseball cap was in possession of a firearm at that location. Wilkers testified that this intersection is "a very high-in-drug-and-crime area." (App. 62.) After quickly completing the traffic stop, the patrolmen responded to the intersection.

The patrolmen activated their vehicle's emergency lights during the drive over, but turned them off as they entered the 200 block of North Clayton Street. The patrolmen did not observe anyone matching the tipster's description at the intersection, but Miller did see an individual matching the description sitting on the front-porch of a residence approximately seventy-five feet from the intersection. Wilkers, who was driving, stopped the car in front of the house. Five to ten other people were in the area, but they did not match the description.

Both patrolmen got out this vehicle and began approaching the porch. Coleman was sitting on the front porch railing. He was "blading" his body away from the patrolmen, but had his head turned toward them, starring at them. According to Wilkers, blading "is a term used when people turn their body, blade their body away from you . . . . in an attempt to conceal an item, conceal contraband from you, conceal a bulge in their pants or their jacket." (*Id.* 59.) Based on Wilkers's training to identify suspects carrying concealed weapons and his experience arresting fifteen or sixteen suspects in possession of concealed firearms, he explained that blading is a trait consistent with suspects concealing weapons. Due to Coleman's posture the patrolmen could not see his hands or the lower part of his chest. Wilkers could see Coleman's elbow, however, which he

3

testified was positioned in such a way to suggest he was holding something against his abdomen.

As the patrolmen approached Coleman, other people in the area "stood up and asked what was going on." (*Id.* 71.) Coleman just stared at the officers. Wilkers described Coleman's reaction as unusual. Based on Coleman's "bladed away" posture, his blank stare, the fact he was holding something close to his abdomen, and the fact he matched the description relayed in the tip, Wilkers became concerned Coleman was armed. Wilkers ordered Coleman to "[s]how [them] his hands" two or three times in a loud and forceful tone. (*Id.* 72.) Coleman did not comply. Then, Wilkers pulled out his taser and repeated this command three or four more times. Coleman neither complied nor changed his posture; "[h]e just kept starring at me and did not move . . . . [and his hands were] [s]till towards his abdomen." (*Id.*)

After Coleman refused to comply with Wilkers's requests, Wilkers put his taser away, walked up on the porch, told Coleman to get on the ground, and grabbed Coleman by the arm. Wilkers used a "little force" to put Coleman face-first on the porch floor. (*Id.* 73.) Coleman did not resist and Wilkers handcuffed him "[f]or [his] safety, just in case [Coleman] was armed." (*Id.*) Then, as Wilkers rolled Coleman to his right side in an attempt to help him up, Coleman's t-shirt slid up and revealed a firearm in his waistband.

Coleman moved to suppress the handgun on August 26, 2008. He argued the

4

patrolmen did not have a reasonable suspicion to stop and search him based on the anonymous tip. Following the evidentiary hearing and a post-hearing briefing, the District Court denied Coleman's motion. It determined that Coleman was seized for Fourth Amendment purposes when Wilkers ordered him to show his hands. However, the Court determined that Wilkers had a reasonable suspicion to seize and pat down Coleman at that point. In a footnote, the District Court noted that "it would reach the same result regardless of when Wilkers seized Coleman during the encounter. If the seizure occurred later in the encounter, the court would have considered Coleman's conduct up to that point, including his failure to comply with Wilkers' Orders." (*Id.* 18 n. 8.)

## II.

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291. *United States v. Johnson*, 592 F.3d 442, 446-47 (3d Cir. 2010). We review a district court's factual findings for clear error, and its legal conclusion that the seizure did not violate the Fourth Amendment *de novo*. *Id.* at 447.

## III.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, provides that people are "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Ordinarily, a seizure must be effected by

5

a warrant based on probable cause to be reasonable under the Fourth Amendment. *Johnson*, 592 F.3d at 447. There is a well-established exception allowing an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Johnson*, 592 F.3d at 447; *see also Terry v. Ohio*, 392 U.S. 1, 19 (1968).[2] Evidence obtained as a result of an investigatory stop that does not meet this exception "must be suppressed as fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citations omitted).

To determine whether a seizure complies with the Fourth Amendment, we must first determine when the seizure occurred. *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). After pinpointing the moment the seizure occurred, we consider whether the seizure was justified by reasonable, articulable facts. *Id.*

Although the parties agree that Coleman was undeniably "seized" by the patrolmen before they found the weapon, they disagree on when. Coleman concurs with the District Court's determination that he was seized when Wilkers ordered him to show his hands pursuant to the *Mendenhall* test. In *United States v. Mendenhall*, the Supreme Court determined "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554 (1980). Coleman

---

[2] A brief investigatory stop is a "seizure" subject to Fourth Amendment protection. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003).

contends a reasonable person would have felt seized as soon as the patrolmen commanded that he show his hands. The Government asserts that Coleman was not seized until Wilkers physically forced Coleman off the railing under the *Hodari D.* test. In *California v. Hodari D.*, the Supreme Court has stated that a "seizure" for Fourth Amendment purposes has occurred only if law enforcement has applied physical force to restrain the suspect, or where the suspect has submitted to law enforcement's assertion of authority. 499 U.S. 621, 626 (1991); *see Brendlin v. California*, 551 U.S. 249, 254 (2007); *Brown*, 448 F.3d at 245. The Government contends that although the officers showed their authority by ordering Coleman to show his hands and drawing a taser on him, because Coleman did not submit to those commands, he was not seized until Wilkers physically restrained him.

Our decision in *United States v. Waterman*, 569 F.3d 144 (3d Cir. 2009), and Supreme Court jurisprudence call into question whether a person can be "seized" for Fourth Amendment purposes when a reasonable person in the same circumstances would not feel free to terminate the encounter with law enforcement, without a law enforcement officer physically restraining the suspect or making a showing of authority to which the suspect submits. *Brendlin*, 551 U.S at 254 (determining a person is only "seized" if physically restrained or he or she submitted to law enforcement's show of authority; anything less is an attempted seizure); *Waterman*, 569 F.3d at 146 ("[W]e have universally looked to the requirements set forth in *Hodari D.* to determine whether a

police encounter with a citizen constitutes a 'seizure.'").

In this case that Coleman did not submit to the patrolmen's show of authority prior to being physically restrained by Wilkers. *Waterman*, 569 F.3d at 146 n.3 (noting "'submission' under *Hodari D.* requires, at minimum, that a suspect manifest compliance with police orders"). Regardless, we need not decide today whether Coleman was seized at the moment Wilkers ordered him to show his hands, or later, when Wilkers physically restrained him, because it was reasonable for Wilkers to seize Coleman in either circumstance.

Government seizure of an individual only violates the Fourth Amendment if that seizure was unreasonable. *Terry*, 392 U.S. at 19 (identifying "the central inquiry under the Fourth Amendment – the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security"). An officer may conduct a brief investigatory stop and pat down the individual "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 123. A reasonable, articulable suspicion is defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. The suspicion must be more substantial than a hunch. *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

To assess whether a stop was supported by a reasonable suspicion, we consider the totality of the circumstances to determine whether the "detaining officers . . . have a

8

particularized and objective basis for suspecting the particular person stopped of criminal activity." *Brown*, 448 F.3d at 246, 247 (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The reasonableness of the officer's suspicions is measured by what the officer knew *before* the stop occurred. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000). An officer is permitted to draw inferences and deductions from prior experience and training. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Brown*, 448 F.3d at 246. Establishing objective specificity does not demand scientific certainty and can be based on observing entirely legal activity. *Johnson*, 332 F.3d at 206.

We start by addressing the reasonableness of Coleman's seizure when Wilkers ordered him to raise his hands, because if that seizure is reasonable any seizure at a later point in the interaction is unquestionably reasonable as well. The factors that informed Wilkers's decision to stop Coleman by commanding him to show his hands were: (1) the dispatch communicating an anonymous tip that a black man, in a black t-shirt and New York Yankees cap, was in possession of a weapon at West Third and North Clayton Streets; (2) Coleman's presence seventy-five feet from the described intersection shortly after the tip was received; (3) the fact Coleman matched the tipster's description; (4) Wilkers's knowledge that the area is a high-crime area; (5) Coleman's blading posture consistent with an individual concealing contraband; (6) the lateness of the hour (1:00 a.m.); and (6) Coleman's lack of response to police presence.

Coleman contends that the seizure was unreasonable because Wilkers's suspicion

relied substantially on the anonymous tip. Both this Court and the Supreme Court have acknowledged that an anonymous tip that a person is carrying a gun, without additional corroboration, "lack[s] the 'indicia of reliability' needed to justify a stop under the reasonable suspicion standard." *Virginia v. Harris*, 130 S. Ct. 10, 10 (2009); *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *Brown*, 448 F.3d at 249. An anonymous tip can only be the basis for reasonable suspicion if accompanied by specific indicia of reliability. *J.L.*, 529 U.S. at 270. We consider five factors to assess whether a tip is reliable:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
> (3) The content of the tip is not information that would be available to any observer . . .
> (4) The person providing the information has recently witnessed the alleged criminal activity.
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility [.]

*United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008). We have also recognized other facts which serve to bolster an insufficient tip, including: (1) presence of the suspect in a high-crime area; (2) presence of the suspect on the street at a late hour; (3) a suspect's nervous or evasive behavior; and (4) any behavior by the suspect that conforms to an officer's specialized knowledge of criminal activity. *Id*.

In this case, the anonymous tip weakly implicates only two of the reliability factors outlined in *Torres*. *Id*. The fact that the tipster reported that Coleman was carrying a

weapon near where he was found suggests the tipster may have recently witnessed Coleman in possession of the weapon, but this suggestion could be easily undercut if Coleman had been at that location for a long time. Moreover, the fact the observer reported a weapon that Coleman actively concealed suggests the tipster may have had information not readily available to other members of the public. However, it is possible Coleman brandished his weapon earlier in the evening. *Id.* That the tip was not communicated face-to-face, law enforcement could not hold the tipster accountable for falsified information, and the tip only weakly implicated the other two factors, weigh against reliability. *Id.* Furthermore, the fact that the tip accurately described Coleman's physical attributes and geographical location does not increase its reliability. "[R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272.[3]

Wilkers, however, did not "seize" Coleman based on the tip alone. His suspicion was also informed by his knowledge that Coleman was sitting on a porch in a high-crime area at a late hour, that Coleman's posture was consistent with someone concealing a

---

[3] Coleman questions whether the tip or the patrolman's observations, suggesting Coleman possessed a weapon, could support a reasonable suspicion of criminal activity because such a suspicion presumes Coleman is not in lawful possession of the handgun. Because Delaware law places the burden on the defendant to prove he had a license to carry a concealed weapon, an officer can presume a subject's possession is not lawful until proven otherwise. *Lively v. State*, 427 A.2d 882, 884 (Del. 1981). Therefore, Wilkers could presume Coleman's possession of the handgun was illegal, despite having no knowledge about whether Coleman could legally possess a gun.

11

weapon, and by Coleman's strange response to the patrolmen's approach. All these factors bolster an insufficient tip and give rise to a reasonable suspicion Coleman was concealing a handgun. *See Torres*, 534 F.3d at 211. Although the anonymous tip was insufficient alone to establish a reasonable suspicion to stop Coleman, when we consider it in combination with the presence of the bolstering factors, we conclude that Wilkers had a reasonable suspicion to stop Coleman before he commanded Coleman to raise his hands.

Given that Wilkers had a reasonable suspicion to seize Coleman *before* he commanded Coleman to show his hands, he undeniably had a reasonable suspicion to seize him later in their interaction as well.[4]

---

[4] This Court considers all the circumstances before a "seizure" when determining if an officer had a reasonable suspicion to stop the suspect; therefore, if Coleman was not seized until Wilkers physically restrained him, then we can consider Coleman's refusal to show his hands in the totality of the circumstances. *Brown*, 448 F.2d at 246, 247. The Government asserts that Coleman's refusal to show his hands bolsters Wilkers's reasonable suspicion that he was concealing a weapon. Coleman contends, however, that his refusal to comply cannot be considered in the reasonable suspicion analysis because we have recognized that refusal to cooperate with law enforcement, without more, does not furnish the minimal level of justification needed for detention or seizure. *Johnson*, 332 F.3d at 218.

Although refusal to comply with law enforcement is not sufficient to support a reasonable suspicion to stop someone alone, it, like all legal activities, can be considered when we assess whether an officer had a reasonable suspicion a suspect was involved in criminal activity. *Johnson*, 332 F.3d at 210 (characterizing refusing an officers request as "evasive action"). That said, we need not decide whether Wilkers's suspicion that Coleman was concealing a weapon was supported by Coleman's refusal to comply with Wilkers's orders because Wilkers had a reasonable suspicion to stop Coleman prior to ordering him to show his hands.

**IV.**

For the foregoing reasons, we will affirm the District Court's denial of the motion to suppress.