IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | | |
|---|---|---|---|
| RON FLOWERS | § | | |
| | § | No. 52, 2018 | |
| Defendant-Below, | § | | |
| Appellant, | § | Court Below: | |
| | § | Superior Court | |
| v. | § | of the State of Delaware | |
| | § | | |
| STATE OF DELAWARE | § | | |
| | § | I.D. No. 1706006410 (N) | |
| Plaintiff-Below, | § | | |
| Appellee. | § | | |

Submitted: September 26, 2018
Decided: September 27, 2018

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Bernard J. O'Donnell, Esquire, Office of the Public Defender, Wilmington, Delaware for the Appellant.

Andrew Vella, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

**VALIHURA**, Justice:

This appeal asks us to decide whether the Superior Court abused its discretion in denying Ron Flowers' motion to suppress. In a bench ruling, the trial court determined that Flowers' actions, when viewed through the eyes of a trained police officer, gave rise to a reasonable, articulable suspicion that Flowers was concealing a firearm. Thus, the trial court found his seizure constitutional. We AFFIRM the decision of the trial court.

I.

Ron Flowers and his co-defendant, Tariq Mariney, were indicted on charges of Drug Dealing, Aggravated Possession of Cocaine, Possession of a Firearm During the Commission of a Felony ("PFDCF"), Carrying a Concealed Deadly Weapon ("CCDW"), two counts each of Possession of a Firearm By a Person Prohibited ("PFBPP") and Possession or Control of Ammunition By a Person Prohibited ("PABPP"), Receiving a Stolen Firearm, and Conspiracy Second Degree.[1] Flowers moved to suppress evidence before trial.[2] In a bench ruling, the Superior Court denied his motion.

Following a two-day trial, a jury convicted Flowers of two counts of PFBPP as well as the CCDW charge.[3] Flowers was sentenced to five years of incarceration followed by descending levels of supervision.

---

[1] Indictment (July 10, 2017), at A006–10 [hereinafter Indictment].

[2] Suppression Hearing Transcript (Nov. 17, 2017), at A028–41 [hereinafter Suppression Hearing Transcript].

[3] Ex. B to Flowers' Opening Br. [hereinafter Sentence Order]. Before trial, the State entered a *nolle prosequi* on the drug-related charges and the conspiracy charge. *Id.* The trial court granted Flowers' motion for acquittal on the Receiving a Stolen Firearm charge. Appendix to Flowers' Opening Br. at A003.

On the night of June 9, 2017, Wilmington Police Detective Alexis Schupp received a tip and reported to Sergeant Michael Gifford that there was a subject at Seventh and West Streets wearing a Phillies shirt, a Phillies hat, and tan shorts who was armed with a gun in his waistband. Sergeant Gifford relayed the tip to members of Wilmington Police Disrupt Squad.[4] The intersection of Seventh and West is a high-crime area.

Around 11 p.m., Corporal Thomas Lynch responded to the call and arrived at the area in a patrol car. He saw two men standing next to a car parked on West Street. The two men were talking to the occupants of the car. One of the two men, Tariq Mariney, matched the description of the subject provided in the tip. The other man, Flowers, was standing next to Mariney.

Mariney stepped back from the parked car as Lynch and other officers approached it. Lynch had a clear line of sight to Flowers. Flowers "turned his body and grabbed an object that was protruding from his waistband."[5] The object appeared to be rectangular and was "kind of tucked under [Flowers'] shirt," and Flowers had his fingers wrapped around the object.[6] Relying on his training and experience, Lynch believed that Flowers' actions were consistent with someone attempting to conceal a firearm.

---

[4] According to the trial court, "Operation Disrupt" is a Wilmington Police Department program designed to "curb the use and possession of deadly weapons, particularly firearms in high crime areas . . . ." *Id.* at A039; *see also id.* at A030. Officers involved in Operation Disrupt typically are deployed in high crime areas during the hours of 2:00 p.m. until 1:00 a.m. because those are generally the hours when crimes are committed. *Id.* at A030. Officers in that unit undertake specialized training to identify armed subjects. *Id.*

[5] *Id.* at A033.

[6] *Id.*

After observing Flowers' actions, Lynch ordered Flowers and Mariney to the ground. Another officer conducted a pat-down of Flowers and discovered a firearm.

On appeal, Flowers contends that the trial court abused its discretion in finding that the police had reasonable, articulable suspicion to seize (or "stop") him in violation of the Fourth Amendment. He claims that this finding is erroneous since the court improperly considered the officer's reliance on a tip from an unknown source. Flowers also argues that his detention went beyond a *Terry* stop and frisk when Lynch ordered him to the ground. He contends that his detention turned into an arrest which requires probable cause. Finally, he argues that the circumstances, viewed in their totality, do not support a finding of probable cause.

## II.

This Court reviews the denial of a motion to suppress for an abuse of discretion.[7] Embedded legal conclusions are reviewed "*de novo* for errors in formulating or applying legal precepts."[8] When we are reviewing the denial of a motion to suppress evidence based on an allegedly illegal stop and seizure, "we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop."[9]

---

[7] *Stafford v. State*, 59 A.3d 1223, 1227 (Del. 2012) (citing *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008)).

[8] *Lopez-Vazquez*, 956 A.2d at 1285 (citations omitted).

[9] *Id.* (citing *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007)).

III.

Flowers' main argument on appeal is that the seizure of him and subsequent pat-down, resulting in the police finding a firearm on his person, was not justified by the requisite reasonable, articulable suspicion that he was armed, and that it was substantially more intrusive than a frisk for weapons ordinarily deemed permissible in such circumstances.

We first set the framework for the analysis. "The United States and Delaware Constitutions protect the right of persons to be secure from 'unreasonable searches and seizures.'"[10] "Generally, '[s]earches and seizures are *per se* unreasonable, in the absence of exigent circumstances, unless authorized by a warrant supported by probable cause.'"[11] However, in certain circumstances, more limited searches and seizures are found reasonable absent a warrant and when based on less than probable cause: when officers have reasonable, articulable suspicion that a suspect is armed and engaged in criminal activity.[12] Under such circumstances, officers may conduct what has become known as a *Terry* stop-and-frisk.

In *Terry v. Ohio*,[13] the United States Supreme Court held as follows:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and

---

[10] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (citing U.S. Const. amend. IV; Del. Const. art. I, § 6). Flowers does not assert any argument based upon the Delaware Constitution.

[11] *Id.* (quoting *Scott v. State*, 672 A.2d 550, 552 (Del. 1996)).

[12] *Miller v. State*, 25 A.3d 768, 771 (Del. 2011) (citing 11 *Del. C.* § 1902; *Terry v. Ohio*, 392 U.S. 1 (1968)).

[13] 392 U.S. 1 (1968).

presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.[14]

The State of Delaware has adopted this holding, and Section 1902 of Title 11 governs such "investigative" or *Terry* stops in this State.[15] Section 1902 provides:

> (a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.

> (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.

> (c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.[16]

In *Terry*, the United States Supreme Court made clear that the *Terry* stop-and-frisk still involves a "seizure" and "search" within the meaning of the Constitution.[17]

---

[14] *Terry*, 392 U.S. at 30–31.

[15] *Hicks v. State*, 631 A.2d 6, 9 (Del. 1993).

[16] 11 *Del. C.* § 1902.

[17] *Terry*, 392 U.S. at 16 ("There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology.").

A person is "seized" when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[18] "Two categories of police-citizen encounters which constitute seizures under the Fourth Amendment have been recognized."[19] First, police may "restrain an individual for a short period of time" to investigate where officers have "reasonable articulable suspicion that the suspect has committed or is about to commit a crime."[20] It requires less than probable cause. This form of seizure is the *Terry* "stop," or investigative stop.[21] For simplicity, we refer to such a seizure as a "stop" in this opinion. Second, the police seize a person when they make an arrest, which requires "probable cause that the suspect has committed a crime."[22]

---

[18] *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)); *see also Curtis v. State*, 15 A.3d 216, 2011 WL 825827, at *2 (Del. Mar. 9, 2011) (Table) ("To determine when a seizure has occurred under article I, Section 6 of the Delaware Constitution, we 'focus[] upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.'" (alteration in original) (quoting *Jones v. State*, 745 A.2d 856, 869 (Del. 1999))).

[19] *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997); *see also Robertson v. State*, 596 A.2d 1345, 1350 (Del. 1991) ("For each encounter between a private citizen and a law enforcement agent, the degree of suspicion required varies with the nature of the seizure. As the stop becomes more invasive, the articulable facts which form the basis of the stop must edge towards probable cause from reasonable suspicion." (citation omitted)).

[20] *Quarles*, 696 A.2d at 1337 (citing *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988)).

[21] *See, e.g.*, *State v. Blackshear*, 2014 WL 1371797, at *2 (Del. Super. Ct. Apr. 7, 2014). *See also Terry*, 392 U.S. at 31 (Harlan, J., concurring) ("A police officer's right to make an on-the-street 'stop' and an accompanying 'frisk' for weapons is of course bounded by the protections afforded by the Fourth and Fourteenth Amendments. The Court holds, and I agree, that while the right does not depend upon possession by the officer of a valid warrant, nor upon the existence of probable cause, such activities must be reasonable under the circumstances as the officer credibly relates them in court.").

[22] *Quarles*, 696 A.2d at 1337. *See also Jarvis v. State*, 600 A.2d 38, 42 (Del. 1991) ("While reasonable suspicion will support a limited search and seizure, it does not justify an arrest. Only

The line between a "stop" and an "arrest" is important because an arrest requires probable cause—more than reasonable, articulable suspicion—in order to be reasonable. A few principles help draw the line. "A stop or detention constitutes a seizure of the person, but, in terms of duration and scope, it is a much more limited intrusion than an arrest."[23] A *Terry* stop must be limited, justified at its inception, and "reasonably related in scope to the circumstances which justified the interference in the first place."[24] An unreasonably intrusive stop may constitute a *de facto* arrest requiring probable cause.[25] Indeed, "[a]lthough an investigatory stop is not an arrest . . . , it may ripen into an arrest if the duration of the stop or the amount of force used in the situation is 'unreasonable.'"[26] But

---

probable cause provides the police the authority to intrude into an individual's privacy to that extent." (citing 11 *Del. C.* § 1904(b)(1); *Thompson v. State*, 539 A.2d 1052 (Del. 1988))).

[23] *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001).

[24] *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cty.*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)); *see also Holden v. State*, 23 A.3d 843, 847 (Del. 2011) ("The scope and duration of the detention must be reasonably related to the initial justification for the traffic stop." (citing *Caldwell v. State*, 780 A.2d 1037, 1046 (Del. 2001))); *Hicks*, 631 A.2d at 12 ("[T]he police must resolve their suspicions in the most expedient manner by diligently pursuing the means of investigation in the least intrusive manner possible." (citation omitted)).

[25] *See Darling v. State*, 768 A.2d 463, 465 (Del. 2001) ("We have concluded under the unique circumstances of this case, that the police conduct in carrying out a plan to surround Darling at gunpoint and order him to the ground was more than a seizure but, in fact, constituted an arrest under both the United States Constitution and the Delaware Constitution." (citing *Jones*, 745 A.2d 856; *Quarles*, 696 A.2d 1334)). *See also Sharpe*, 470 U.S. at 685 (acknowledging "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest" and observing that, "[o]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"); *United States v. Goode*, 309 Fed. App'x 651, 653 (3d Cir. 2009) ("In determining whether a *Terry* stop has escalated into an arrest, we assess 'the reasonableness of the intrusion . . . , balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.'" (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995))).

[26] *Wiers v. Barnes*, 925 F. Supp. 1079, 1087 (D. Del. 1996) (citing *Terry*, 392 U.S. 1; *Sharpe*, 470 U.S. at 682–88).

8

"[a] *Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable."[27] The form of "search" deemed "reasonable" under such circumstances is also a limited one: a "frisk" or pat down to find weapons.[28]

With this basic framework in mind, we turn to Flowers' argument that his stop and being ordered to the ground by the officers was not based on reasonable, articulable suspicion, that it exceeded mere detention, and that "[a] seizure of this scope is substantially more intrusive than an ordinary *Terry* frisk for weapons."[29] We disagree with each of his contentions.

"Determining whether an officer had reasonable and articulable suspicion to conduct a stop requires a threshold finding of when the stop actually took place."[30] Although this point was not specifically briefed below, both Flowers[31] and the State assumed that he was seized *after* the officers observed him "blading his body and grasping his waistband."[32]

---

[27] *United States v. Jones*, 973 F.2d 928, 931 (D.C. Cir. 1992) (citing *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989)).

[28] *See Terry*, 392 U.S. at 26 (1968) ("[I]t must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion.").

[29] Flowers' Opening Br. at 8.

[30] *Lopez-Vazquez*, 956 A.2d at 1286; *see also Terry*, 392 U.S. at 21–22 (the court must consider only "the facts available to the officer at the moment of the seizure or the search").

[31] Flowers' Motion to Suppress (Sept. 12, 2017), at A011–15 [hereinafter Motion to Suppress].

[32] *Id.* at A13 ("When [police] arrived, they noticed a different subject [Flowers], in a white t-shirt blading his body and grasping his waistband. Based upon that, they seized that individual and

9

The Superior Court determined that the officers had reasonable articulable suspicion to detain Flowers after observing Flowers' behavior. The relevant parts of the trial court's bench ruling where it found "reasonable, articulable suspicion" are as follows:

> According to Corporal Lynch's testimony, the defendant turned around. He saw the defendant turn his body to I guess what's call [sic] in a term of art, blading his body, which was to show the narrower side of the body from side body to the other side of the body. And it seemed to Detective Lynch that he saw a rectangular object under clothing on the right side of the defendant's body in his waistband.
>
> Those actions, according to Corporal Lynch, were consistent in his mind with a person attempting to conceal a weapon, hence, the crime of carrying a concealed deadly weapon under Delaware law.
>
> He came to this conclusion in part because of his observations of the normal human being, but also in part of his training in weapons detection and criminal suspect's behavior that was part of his law enforcement training.
>
> So he then exited his vehicle. And he directed, I believe his testimony, all four individuals to the ground, Tarik [sic] Marini and Ron Flowers, and two individuals who were a little further around. And the police officer testified that, Corporal Lynch did, he believed it was very possible that the defendant, in fact, had a gun.
>
> Now, the key question I think or a key question is whether or not the officer was authorized by law to order the defendant to the ground. But I think he was permitted under the circumstances then to order the defendant to the ground. *Terry* and its progeny speak of forceable [sic] detentions. A detention can be just as forceable [sic] if somebody is given a pat-down while they are standing up. Yeah, it's a bit more of an intrusion of a person's liberty to be ordered to lie down, that's for sure. But it's a paramount consideration for officer safety to make the individual less likely to be able to inflict harm on a police officer or anyone else.
>
> I think it's correct, as [defense counsel] argued, that the original tip that had come in, which was to say that the person with the red Phillies shirt and hat and tan pants was the one who had the gun. And that proved not to be the

searched him.").

10

case. The officer didn't know that at the time. He wasn't close enough. But I think that's part of the quantum of suspicion that Officer Lynch fairly possessed in order to assess in this very fast breaking situation means to frisk the defendant, to do a pat-down for officer safety with the defendant on the ground rather than standing up.

. . .

So the bottom line in my thinking is that the officer had reasonable articulable suspicion to pat down the defendant, including the forceable requirement of him - - of defendant being forced to the ground.

. . .

I might mention also that the officer testified to this, I believe, that as he turned away from the officer, the defendant's shirt became tight to the body on the right side, and I think he said this, and he placed his right hand over the object. So I think there was more than enough reasonable articulable suspicion to have allowed the pat-down of the defendant in the manner done.[33]

In *Bryant v. State*,[34] this Court stated that "reasonable articulable suspicion" is demonstrated by "an officer's ability to point to specific and articulable facts which, taken together with rational inference from those facts, reasonably warrant the intrusion."[35] Further, "[a] determination of reasonable suspicion must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an

---

[33] Suppression Hearing Transcript, *supra* note 2, at A040–41.

[34] *Bryant v. State*, 156 A.3d 696, 2017 WL 568345, at *1 n.1 (Del. 2017) (Table) (citing *Jones*, 745 A.2d at 861). *See generally United States v. Cortez*, 449 U.S. 411, 417–418 (1981).

[35] *Bryant*, 2017 WL 568345, at *1 n.1 (quoting *Jones*, 745 A.2d at 861); *see also Terry*, 392 U.S. at 21 ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.").

officer's subjective interpretation of those facts."[36]  "In determining whether there was reasonable suspicion to justify a detention, the court defers to the experience and training of law enforcement officers."[37]

In this case, Corporal Lynch testified that he had made many arrests based upon the "blading" movement and had received training in the police academy and from courses on street crime as to how to recognize the characteristics of an armed person.  Lynch ordered Flowers to the ground because he believed Flowers was armed after seeing Flowers grab a rectangular object protruding from Flowers' waistband.  The trial court had also noted that the location of Flowers' stop was in a high-crime area and it occurred late at night.  Based upon this record, the evidence supports a finding of reasonable and articulable suspicion.

Nor did the trial court err in concluding that there were grounds not just for the stop, but also for forcing Flowers to the ground and frisking him.  "During a *Terry* stop, officers may take measures that are reasonably necessary to protect themselves and maintain the status quo."[38]  A police officer is empowered to "take necessary measures to determine whether [an individual] is in fact carrying a weapon and to neutralize the threat of physical harm" when the officer "is justified in believing that the individual whose suspicious

---

[36] *Bryant*, 2017 WL 568345, at *1 n.1 (quoting *Jones*, 745 A.2d at 861).

[37] *Woody v. State*, 765 A.2d, at 1262 (citations omitted).

[38] *Goode*, 309 F. App'x at 654 (3d Cir. 2009) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *see also Dunaway v. New York*, 442 U.S. 200, 208–09 (1979) ("*Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must be based on probable cause," and noting that *Terry* "involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an 'arrest.'").

behavior he is investigating at close range is armed and presently dangerous to the officer or to others."[39]

During an investigative stop, officers may, under appropriate circumstances, search the detainee to determine whether he is armed.[40] An officer may conduct such a search for weapons if "he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."[41] The search must be strictly circumscribed by the exigencies that justify its initiation.[42]

---

[39] *Terry*, 392 U.S. at 24. *See also Adams v. Williams*, 407 U.S. 143 (1972) (holding that a tip from a known informant was sufficiently reliable to justify a frisk for weapons on the basis of reasonable suspicion); *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (finding an order to exit car a permissible '*de minimis*' intrusion after car is lawfully detained after traffic violations; frisk for weapons was justified based upon "bulge" observed in jacket).

[40] *Terry*, 392 U.S. at 27.

[41] *Id.*

[42] LaFave notes a number of circumstances that some courts have deemed sufficient to justify a protective search including the following:

> . . . a characteristic bulge in the suspect's clothing; observation of an object in the pocket which might be a weapon; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; movement under a jacket or shirt "consistent with the adjustment of a concealed firearm"; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifesting an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct (but not more ambiguous "record" information); awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defensive action because of a misunderstanding of the officer's authority or purpose, as well as other "characteristics of an armed gunman."

Generally, a show of force, including the use of drawn weapons, does not render an investigative stop unreasonable if the police determine that it is "reasonably necessary to protect themselves and maintain the status quo."[43] However, "the use of guns and handcuffs during an investigatory stop must be justified, and [courts] are required to look 'at the intrusiveness of all aspects of the incident in the aggregate.'"[44] Similarly, forcing a detainee to lie down to prevent flight might be justified under the circumstances.[45] Factors courts apply in determining whether a show of force is justified include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[46] The United States Supreme Court has cautioned that "[t]he calculus of

---

4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.6(a) (5th ed. 2012).

[43] *Goode*, 309 Fed. App'x at 654 (citing *Hensley*, 469 U.S. at 235).

[44] *United States v. Coker*, 223 Fed. App'x 136, 141 (3d Cir. 2007) (quoting *Baker*, 50 F.3d at 1193).

[45] *See, e.g.*, *Laing*, 889 F.2d at 285 (D.C. Cir. 1989) (citing *United States v. Taylor*, 716 F.2d 701, 708-09 (9th Cir. 1983)).

[46] *Graham v. Connor*, 490 U.S. 386, 396 (1989). *See also United States v. Ocampo*, 890 F.2d 1363, 1369 (7th Cir. 1989) (factors courts apply in determining whether a show of force is justified include "[t]he nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day[,] and the reaction of the suspect to the approach of the police" (citations omitted)); *Perea*, 986 F.2d 633, 645 (2d Cir. 1993) ("In assessing whether the degree of restraint was 'too intrusive to be classified as an investigative detention,' we have considered in general the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." (citations omitted)); *United States v. Jones*, 759 F.2d 633, 639, 640 n.8 (8th Cir. 1985) (considering "the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation . . . the need for immediate action by the officers and lack of opportunity for them to have made the stop in less

14

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[47]

Examples of situations in which courts have found a show of force reasonable include instances where a suspect failed to comply with an officer's command to show his hands,[48] where a reliable informant advised the police that a suspect was armed,[49] or where the police had reasonable suspicion that a suspect was armed and dangerous due to the nature of the offense under investigation.[50]  Here, the trial court properly found that the

threatening circumstances.").

[47] *Graham*, 490 U.S. at 396-97; *cf. Sharpe*, 470 U.S. at 685 ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.").

[48] *See, e.g.*, *United States v. Fields*, 449 Fed. App'x 146, 147–49 (3d Cir. 2011) (holding that the use of physical force, including a Taser, during a *Terry* stop was "reasonable under the objective reasonableness standard" where the suspect "did not yield to the show of authority and created an environment where the [o]fficers felt threatened" by refusing to show his hands (citing *Graham*, 490 U.S. at 388)); *see also United States v. Prince*, 157 F. Supp. 2d 316, 325 (D. Del. 2001) (holding that "the use of handcuffs and the placing of [a suspect] in the police car were reasonably necessary to assure officer safety and maintain the status quo" where the suspect had been evasive and "was emotional and upset," and the only officer available to supervise the suspect had to turn her back on the suspect in order to move about the scene).

[49] *See, e.g.*, *United States v. Johnson*, 592 F.3d  442, 452–53 (3d Cir. 2010) (concluding that officers reasonably drew their weapons when approaching a taxi matching the description of a suspect's vehicle, reasoning that the officers acted on a reliable tip that the occupants of the taxi were armed and dangerous, and their conduct was limited to that which was "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop"); *United States v. Grant*, 256 F. Supp. 2d 236, 246 (D. Del. 2003) (concluding that surrounding the suspects' vehicle and approaching with weapons drawn was reasonable where an informant had told police that the suspects had a loaded gun in the front seat).

[50] *See, e.g.*, *Buckingham v. State*, 482 A.2d 327, 332 (Del. 1984) (holding that an "initial detention was a lawful, limited intrusion reasonably justified under the circumstances" where an officer ordered three suspects to exit a vehicle at gunpoint after the officer learned from two "reliable sources" that an armed robbery had just occurred at a nearby supermarket and one of the passengers had just run to the vehicle from the supermarket); *Virgin Islands v. Blyden*, 437 Fed. App'x 127,

evidence supported the frisk of Flowers and forcing him to the ground because Lynch had reasonable, articulable suspicion that Flowers was armed and dangerous.

On appeal, Flowers seeks to raise what the State claims is a new argument. Flowers argues that the trial court improperly considered the officers' reliance on a tip from an unknown source in determining that the police possessed reasonable, articulable suspicion to detain him. At the suppression hearing, Gifford testified that Schupp relayed a tip that he had received from an informant describing a man with a gun at Seventh and West Street.[51] Gifford did not know whether the informant was known or an anonymous tipster. The State, in its response to Flowers' motion,[52] argued that the tipster was "a past-proven confidential source" who stated that "a black male wearing a Phillies hat, Phillies shirt, and tan shorts was armed with a black handgun in his waistband."[53] But Flowers now seeks to de-emphasize evidence regarding Corporal Lynch's observations by contending that Flowers' movements "played little, if any part" in the decision to search him.[54] Instead, Flowers argues that information derived from an unknown source does not warrant seizure

___

129 (3d Cir. 2011) (concluding that "officers were acting appropriately when they stopped [a suspect] with guns drawn and immediately handcuffed him, as he was fleeing a shooting and was likely armed"); *United States v. Coker*, 223 Fed. App'x 136, 140 (3d Cir. 2007) (concluding that jumping on the hood of a vehicle and ordering the suspects to exit the vehicle at gunpoint was "reasonable to protect the safety of all of the officers at the scene" where officers suspected that the occupants had participated in an attempted kidnapping and shooting and were armed and dangerous).

[51] Suppression Hearing Transcript, *supra* note 2, at A030–31.

[52] State's Response to Defendant's Motion to Suppress (Nov. 3, 2017), at A017–25 [hereinafter State's Response].

[53] *Id.* at A018, A025.

[54] Flowers' Opening Br. at 9.

and deprivation of liberty. The State contends that this argument was not raised below and was waived. We agree.

But, even assuming the argument had been sufficiently presented below, we reject it. The evidence supports the trial court's conclusion that the officers did not stop Flowers until *after* they had independent, ample corroboration of Flowers' suspicious behavior as the officers testified. When he arrived at the scene, Corporal Lynch saw Flowers reach for something in his waistband and wrap his fingers around a rectangular object. Also, Corporal Lynch saw Flowers "blade" his body away from the advancing officers. At that point, the officers possessed reasonable, articulable suspicion to detain Flowers, force him to the ground, and pat him down. And, although the Superior Court referred to the tip in setting forth the facts, the trial court relied primarily on Corporal Lynch's testimony as the "critical phase of the facts." In closing arguments, the State acknowledged that the tip prompted the officers to go to that location, but once the officers arrived there, they observed Flowers' conduct which justified the detention and pat down. Moreover, the officers had made other gun arrests that Friday night in Wilmington just blocks from that location. The area was known as a high crime area. These are all factors properly considered in the reasonable suspicion analysis.[55]

---

[55] *See*, *e.g.*, *Rollins*, 922 A.2d at 385 (following United States Supreme Court precedent in observing that, "[w]hile obviously insufficient by itself to amount to reasonable suspicion, the 'fact that the stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis.'" (citations omitted)); *Woody v. State*, 765 A.2d at 1265.

This conclusion is consistent with the United States District Court for the District of Delaware's holding in *United States v. Coleman*.[56] In *Coleman*, officers on patrol in Wilmington received a dispatch over the radio calling for units to respond to the area of West Third Street and North Clayton Street regarding an armed subject. The radio dispatch was based upon an anonymous tip that a black male wearing a black t-shirt and a New York Yankees baseball cap had a firearm. One officer observed an individual sitting on the front porch of a home about 75 feet from the intersection of Third and Clayton Streets.

Two officers approached Coleman who was sitting on the front porch railing. He matched the description provided in the radio dispatch. Unlike other people in the vicinity who stood up and inquired as to what was going on, Coleman remained seated on the railing "with his body 'bladed away' from the officers."[57] Coleman's hands were pulled toward his abdomen as if he were grabbing or holding an object against his stomach and attempting to conceal it. He did not speak to the officers but continued to look at them with "an empty, blank stare on his face."[58] One officer stated that Coleman's behavior was "not normal."[59]

The officer became concerned that Coleman was armed. He ordered Coleman, in a loud, forceful tone of voice, to show his hands, drawing his Taser at one point. The officers put away the Taser, walked up to the porch and told Coleman to get on the ground and

---

[56] 2009 WL 395218 (D. Del. Feb. 17, 2009), *aff'd*, 383 Fed. Appx. 180 (3d Cir. 2010).

[57] *Id.* at *2.

[58] *Id*.

[59] *Id*.

grabbed his arm. When handcuffing him and helping him stand up, Coleman's t-shirt revealed a firearm in his waistband.

Coleman contended that he was unlawfully seized in violation of his Fourth Amendment rights.[60] But the court noted eight factors had informed the officer's decision to stop and pat-down Coleman: (1) the radio call with the tip; (2) Coleman's presence near the intersection; (3) his match to the description in the dispatch; (4) the lateness of the hour (1:00 a.m.); (5) his knowledge that the area was a high crime area where many shootings had occurred; (6) the response of others and Coleman's lack of response; (7) his posture; and (8) his failure to show his hands as ordered.

The court observed that a tip is not reliable merely because its description of the subject proves to be accurate. It noted that radio tip was, at first, "nothing more than Coleman's 'readily observable location and appearance,' which is insufficient on its own to support a finding of reasonable suspicion."[61] But the court concluded that the officer "observed a number of factors indicating suspicious behavior, which served to corroborate the otherwise unreliable tip."[62] Accordingly, the *Coleman* trial court found that the seizure

---

[60] In affirming the decision of the District Court, the Court of Appeals for the Third Circuit observed that it "need not decide today whether Coleman was seized at the moment Wilkers [the officer] ordered him to show his hands, or later, when Wilkers physically restrained him, because it was reasonable for Wilkers to seize Coleman in either circumstance." *U.S. v. Coleman*, 383 Fed. Appx. 180, 184 (3d Cir. 2010).

[61] *Coleman*, 2009 WL 395218, at *7.

[62] *Id*. at *8. *See also Miller*, 25 A.3d at 771 ("An informant's tip may provide reasonable suspicion for a stop and seizure where the totality of the circumstances, if corroborated, indicates that the information is reliable."); *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006). In *Brown*, the United States Court of Appeals for the Third Circuit noted factors that both the Supreme Court and it have identified as "suggesting suspicious behavior, including: (1) the presence of an individual in a high crime area; (2) the lateness of the hour; (3) an individual's 'nervous, evasive'

and pat-down of him was based upon reasonable suspicion and it denied his motion to suppress. In affirming the decision, the Third Circuit agreed that the officer had not seized Coleman based upon the tip alone. Rather, the other factors, noted above, "bolster[ed] an insufficient tip and [gave] rise to a reasonable suspicion [that] Coleman was concealing a handgun."[63]

As in *Coleman*, although the tip was reliable only in part (as it was Mariney whose clothes matched the description in the tip), the officers' independent observation of Flowers' suspicious behavior justified his stop and being forced to the ground. This is significant because "[l]aw enforcement officers must be aware of the facts constituting reasonable suspicion before a detention [*i.e.*, stop] is effectuated."[64] As explained above, Flowers was detained only after Corporal Lynch observed the rectangular object under Flowers' clothing in Flowers' waistband. Further, we agree with the trial court that Flowers' stop did not escalate into an arrest. Here, the police action did not exceed the permissible scope of a *Terry* stop. The Superior Court correctly concluded that the weapon seized from Flowers should not have been suppressed.

---

behavior; and (4) and individual's acts in conformance with the police officer's specialized knowledge of criminal activity." *Coleman*, 2009 WL 395218, at *8 (citing *Brown*, 448 F.3d at 251) (collecting cases). That court noted further that while the factors standing alone "may be insufficient to establish reasonable suspicion, [] if observed by police they can serve to corroborate an otherwise insufficient tip." *Id.* (omission in original). *See also* LaFave, *supra* note 42, § 9.6(a).

[63] 383 Fed. Appx. at 185–86. ("Although the anonymous tip was insufficient alone to establish a reasonable suspicion to stop Coleman, when we consider it in combination with the presence of the bolstering factors we conclude that [the officer] had a reasonable suspicion to stop Coleman before he commanded Coleman to raise his hands.").

[64] *Woody*, 765 A.2d at 1263. *See also Lopez-Vazquez*, 956 A.2d at 1286.

Accordingly, the decision of the trial court is AFFIRMED.