IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARVIN SWANSON, | § | |
| | § | No. 489, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2312007369 (N) |
| | § | |
| Appellee. | § | |

Submitted: September 24, 2025
Decided: December 15, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED.**

Nicole M. Walker, Esquire, OFFICE OF THE PUBLIC DEFENDER, Wilmington, Delaware for Appellant.

Jordan A. Braunsberg, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

*INTRODUCTION*

On August 7, 2024, a Superior Court jury convicted Marvin Swanson ("Swanson") of Possession of a Firearm by a Person Prohibited ("PFBPP") and Possession of Ammunition by a Person Prohibited ("PABPP").[1]  Swanson raises two issues on appeal. First, he argues that the Superior Court erred in denying his Motion to Suppress because the evidence was collected pursuant to an unconstitutional seizure.  Second, Swanson argues that the trial court violated his right to trial by an impartial jury by failing to conduct a sufficient inquiry into "victim bias" during *voir dire*.  We conclude that the Superior Court erred in denying Swanson's Motion to Suppress because his transport to the police station constituted a *de facto* arrest unsupported by probable cause.  Because we reverse Swanson's conviction on that ground, we do not reach his second issue challenging the *voir dire*.

## I.   *FACTUAL AND PROCEDURAL BACKGROUND*

While conducting routine social media surveillance on August 22, 2023, Wilmington Police Detective Anthony Lerro ("Detective Lerro") identified Marvin Swanson ("Swanson") in a video posted on Swanson's Instagram story.[2]  The video showed Swanson at 23rd and Jessup Street wearing a white bucket hat, a black hoodie with Rick and Morty symbols, and ripped jeans.[3]  Detective Lerro screen-recorded the video at 1:25

---

[1] App. to Opening Br. On Appeal of Def.-Below/Appellant at A1 [hereinafter A__] (Superior Court Criminal Docket at 1).

[2] A51–56 (Motion to Suppress Hearing at 7–12).

[3] A55–56 (Motion to Suppress Hearing at 11–12).

p.m. that day, about 30 minutes after the video was posted. Detective Lerro stated that after watching the video five times, he believed the video showed Swanson, a person prohibited, (1) using his hands to mimic the act of shooting a gun and (2) lifting his hoodie to reveal what he believed to be a magazine or firearm in his waistband. Detective Lerro noted that the "Nike" brand on Swanson's waistband was obstructed by what he thought was the magazine or handle, and in Detective Lerro's experience, individuals commonly use that particular spot in their waistband to hold a gun.

Around 1:50 p.m., a past-proven reliable confidential informant (the "CI") texted Detective Lerro a screen recording of the same video of Swanson, noting that the CI saw Swanson in possession of a firearm in the video. Detective Lerro testified that about twenty minutes later around 2:10 p.m., the CI contacted him again "advising [that] he was in the same area as Mr. Swanson[,]" that "[Swanson] was still in possession of a firearm[,]" and "that Mr. Swanson was wearing a white bucket hat" and the same clothing as in the video.[4] Detective Lerro testified that based on the second communication from the CI, he believed that the CI arrived at 23rd and Jessup and personally observed Swanson with a firearm.[5]

Shortly thereafter, at 2:15 p.m., Detective Lerro and several other officers including Investigator Linkhurst travelled to 23rd and Jessup in an unmarked black Dodge Durango. Detective Lerro, sitting in the front passenger seat with the window open, heard people

---

[4] A69–70 (Motion to Suppress Hearing at 25–26).

[5] A77 (Motion to Suppress Hearing at 33):

> Q: Now, the informant had told you about five minutes before, that he personally observed [Swanson] with a firearm; correct?
>
> A: Correct.

3

"calling out" the police vehicle as they approached the scene. When the officers arrived at the scene, Detective Lerro saw Swanson—wearing the same clothing as in the video. They also observed the CI in the area. Investigator Linkhurst—believing that Swanson was illegally in possession of a firearm—conducted a pat down of Swanson. The pat down did not reveal any firearms on Swanson's person.

The officers then searched the immediate surrounding area because a "call out" often causes individuals to discard weapons and contraband. During the search, officers found a loaded silver and black handgun with an extended magazine inside a recycling bin about 25 to 30 feet from the location where Investigator Linkhurst detained Swanson.[6] The officers handcuffed Swanson and placed him in the back of their vehicle while they secured the firearm. Detective Lerro testified that he believed he had probable cause to arrest Swanson at the time the officers found the firearm in the recycling bin, but declined to arrest him at this time because Detective Lerro wanted to confirm Swanson's possession of the gun through DNA testing first.[7]

---

[6] A80–81 (Motion to Suppress Hearing at 36–37). The gun was found on top of the trash that was in the bin.

[7] A81 (Motion to Suppress Hearing at 37):

> Q: At the time that you found the firearm in the trash, did you believe that you had probable cause to arrest the defendant?
>
> A: Yes.
>
> Q: Did you, in fact, arrest him at that time?
>
> A: No.
>
> Q: Why not?

4

Since DNA testing was not possible at the scene, the officers transported Swanson to the Wilmington Police Station where the police store DNA testing kits. After the officers brought Swanson to the station's turnkey area, Swanson, without any verbal prompt from the officers, volunteered to provide his DNA.[8] Detective Lerro testified that if Swanson had not voluntarily consented to DNA testing, he would have drafted a search warrant.[9] After Detective Lerro swabbed Swanson's cheeks at 3:10 p.m., Swanson was free to leave—approximately one hour after Investigator Linkhurst first detained him.[10]

The Superior Court found that "[t]he results of the DNA testing from the gun revealed that Defendant's DNA matched the DNA retrieved from the handgun collected at the scene."[11] A few months later, on December 18, 2023, Wilmington police officers arrested Swanson for PFBPP and PABPP. On April 12, 2024, Swanson moved to suppress the DNA sample taken, along with the items seized from him and statements made by him at the station. He argued that the preceding stop and detention were unconstitutional. The Superior Court, when denying the motion on July 19, 2024, held that the stop, detention, and transportation were all permissible because (1) "the officers had reasonable articulable suspicion to stop and detain [Swanson] pursuant to 11 *Del. C.* § 1902" and (2) "[t]he

---

A: I thought it was a better idea to get his DNA and let the DNA confirm if it was, in fact, in his possession.

[8] A83–84 (Motion to Suppress Hearing at 39–40). Swanson did not dispute that the *Miranda* warnings were proper. Nor did he suggest that his consent was in any way coerced or involuntary. *State v. Swanson*, 2023 WL 11876797, at *3 (Del. Super. July 19, 2024).

[9] A84 (Motion to Suppress Hearing at 40).

[10] A84–85 (Motion to Suppress Hearing at 40–41).

[11] *Swanson*, 2023 WL 11876797, at *3.

5

detention and transportation were reasonable, necessary, and related in scope to the investigation."[12]

## *II. CONTENTIONS ON APPEAL*

Swanson raises two arguments on appeal. First, Swanson argues that the Superior Court erred in denying his Motion to Suppress because (1) the Instagram video and CI tip did not provide the police with reasonable articulable suspicion to stop and detain him and (2) the police converted the stop into a *de facto* arrest without probable cause when they transported him to the police station. In response, the State contends that the trial court properly denied Swanson's Motion to Suppress because (1) the police possessed reasonable articulable suspicion to stop and detain Swanson based on the totality of the circumstances, and (2) Swanson's transport did not constitute a *de facto* arrest because the transport was minimally intrusive and reasonably related to the original stop. The State argues, alternatively, that even if the transport were a *de facto* arrest, it was supported by probable cause.

Second, in a claim first raised on appeal, Swanson argues that the Superior Court violated his right to trial by an impartial jury when the court failed to ask during *voir dire* whether potential jurors had been or were currently a victim in a criminal case.

---

[12] *Id.* at *9.

## III. STANDARD OF REVIEW

"We apply a mixed standard of review to a trial court's order denying a motion to suppress evidence after an evidentiary hearing."[13] "We review findings of fact for clear error, but we exercise *de novo* review over legal determinations."[14] "Once the historical facts are established, the legal issue is whether an undisputed rule of law is violated."[15] "When we are reviewing the denial of a motion to suppress evidence based on an allegedly illegal stop and seizure, 'we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop.'"[16] "Whether the established facts support the trial court's probable-cause determination is a question of law subject to *de novo* review."[17]

## IV. ANALYSIS

For the following reasons, we hold that (1) the initial detention was supported by reasonable articulable suspicion, (2) the detention ripened into a *de facto* arrest when Swanson was transported to the police station, and (3) the *de facto* arrest was not supported by probable cause.

---

[13] *McDougal v. State*, 314 A.3d 1077, 1086 (Del. 2024); *see also Register v. State*, 337 A.3d 1224, 1231–32 (Del. 2024).

[14] *McDougal*, 314 A.3d at 1086 (quoting *Garnett v. State*, 308 A.3d 625, 641 (Del. 2023)).

[15] *Id.* (quoting *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007)); *see also Register*, 337 A.3d at 1232.

[16] *McDougal*, 314 A.3d at 1086 (quoting *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008)); *see also Rollins*, 922 A.2d at 382.

[17] *Juliano v. State*, 260 A.3d 619, 626 (Del. 2021).

"In Delaware, both the Fourth Amendment to the U.S. Constitution and Article I, § 6 of the Delaware Constitution protect individuals from unreasonable searches and seizures."[18] "Two categories of police-citizen encounters which constitute seizures under the Fourth Amendment have been recognized[:]" *Terry* stops and arrests.[19] "Generally, '[s]earches and seizures are *per se* unreasonable, in the absence of exigent circumstances, unless authorized by a warrant supported by probable cause.'"[20] However, "police may 'restrain an individual for a short period of time' to investigate where officers have 'reasonable articulable suspicion that the suspect has committed or is about to commit a crime.'"[21] "This standard is codified in 11 *Del. C.* § 1902[,]"[22] and this form of seizure is

---

[18] *Womack v. State*, 296 A.3d 882, 889 (Del. 2023).

[19] *Flowers v. State*, 195 A.3d 18, 24 (Del. 2018) (quoting *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997)).

[20] *Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (quoting *Scott v. State*, 672 A.2d 550, 552 (Del. 1996)).

[21] *Flowers*, 195 A.3d at 24 (quoting *Quarles*, 696 A.2d at 1337).

[22] *McDougal*, 314 A.3d at 1086. In Delaware, pursuant to Title 11:

> (a) A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination.
>
> (b) Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further questioned and investigated.
>
> (c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

11 *Del. C.* § 1902.

known as a *Terry* stop.[23]  Additionally, "police seize a person when they make an arrest, which requires 'probable cause that the suspect has committed a crime.'"[24]

### A.  Permissible Scope of the Investigative Detention

#### 1.  The Continued Detention Did Not Exceed the Permissible Scope of a Terry Stop

Neither party contests that the pat down was a *Terry* stop.  However, Swanson argues that the officers exceeded the proper scope of a *Terry* stop by (1) continuing to detain him while the officers searched the surrounding area after the pat down and (2) transporting him to the police station for DNA testing.  "Delaware's two-hour statute, 11 *Del. C.* § 1902, statutorily authorizes the detention of a person for two hours while the investigation unfolds except for purposes prohibited by the Fourth and Fourteenth Amendments."[25]  To comply with the Fourth and Fourteenth Amendments, a *Terry* stop "must be minimally intrusive and reasonably related in scope to the circumstances which justify the interference."[26]  Courts must "look 'at the intrusiveness of all aspects of the incident in the aggregate'" when determining whether this balancing test is satisfied.[27]  If a *Terry* stop is unreasonably intrusive, it may ripen into a *de facto* arrest.[28]  "The line between a 'stop' and an 'arrest' is

---

[23] *Flowers*, 195 A.3d at 24.

[24] *Id.* at 25 (quoting *Quarles*, 696 A.2d at 1337).

[25] *State v. Garvin*, 2006 WL 1520185, at *3 (Del. Super. Jan. 6, 2006).

[26] *Hicks v. State*, 631 A.2d 6, 11 (Del. 1993); *see also Flowers*, 195 A.3d at 25.

[27] *Flowers*, 195 A.3d at 29 (quoting *United States v. Coker*, 223 F. App'x 136, 141 (3d Cir. 2007)).

[28] *See United States v. Sharpe*, 470 U.S. 675, 685 (acknowledging "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest" and observing that, "[o]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop"); *see also Womack*, 296 A.3d at 891 ("[A]n investigatory stop "may ripen into an arrest if the duration of the stop or the amount of force used in the situation is unreasonable." (quoting *Flowers*, 195 A.3d at 25)).

important because an arrest requires probable cause—more than reasonable, articulable suspicion—in order to be reasonable."[29]

Swanson argues that the officers first crossed that line when they continued to detain him after the initial pat down. Swanson also alleges that any reasonable articulable suspicion that he had a firearm was dispelled when no weapons were found on Swanson's person during the pat down. "The reasonable scope of an investigatory detention is determined by balancing the government's need to search against the invasion of the person who is the object of the search."[30] "During a *Terry* stop, officers may take measures that are reasonably necessary to protect themselves and maintain the status quo."[31]

Here, the officers initially stopped Swanson to search for a firearm. After no firearm was found on Swanson's person, the officers decided to search the surrounding area because they believed that Swanson may have discarded the firearm when he heard the "call out."[32] The officers did not increase the level of intrusion by using handcuffs or any

---

[29] *Flowers*, 195 A.3d at 25.

[30] *Hicks*, 631 A.2d at 10; *see also Flowers*, 195 A.3d at 25; *Howard v. State*, 931 A.2d 437, 2007 WL 2310001, at *3 (Del. Aug. 14, 2007) (ORDER) ("The duration and investigation following a stop 'must be reasonably related in scope to the justification for their initiation.'" (citing *Caldwell v. State*, 780 A.2d 1037, 1046 (Del. 2001))).

[31] *Flowers*, 195 A.3d at 28 (quoting *United States v. Goode*, 309 F. App'x 651, 654 (3d Cir. 2009)) (finding that the "frisk of Flowers and forcing him to the ground" was permissible where the officer "had reasonable, articulable suspicion that Flowers was armed and dangerous"); *see also Howard*, 2007 WL 2310001, at *3 (finding a 40–minute stop permissible where the delay was necessary to use the least intrusive search technique).

[32] Detective Lerro testified that "call outs" "give people that are in the block or in the immediate area that are involved in illegal activity, whether it's firearms, drug related, or wanted in reference to other related things, time to either leave the area or get whatever they have on them off of them." A73 (Motion to Suppress Hearing at 29).

10

other type of force while they searched. This continued detention merely maintained the *status quo* at the scene for a few minutes. Additionally, the search was directly related to the officer's reason for the initial stop—to search for a firearm. In these circumstances, the continued detention was reasonable and did not exceed the stop's permissible scope.

### 2. Swanson's Transport Was Indistinguishable from an Arrest

The same cannot be said about the subsequent transport of Swanson to the police station. Reasonable articulable suspicion "will continue to justify the detention in its various phases until such time as the duration of the seizure or the level of intrusion elevates the deprivation of liberty to the status of an arrest."[33] "Under Delaware law, an arrest 'is the taking of a person into custody in order that the person may be forthcoming to answer for the commission of a crime."[34] Although transport of a suspect does not automatically convert a *Terry* stop into an arrest, the United States Supreme Court has recognized that transport to a police station can be "in important respects indistinguishable from a traditional arrest."[35]

In *Dunaway v. New York*, the United States Supreme Court found a detention indistinguishable from a traditional arrest where the suspect "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room."[36] The *Dunaway* court noted that

---

[33] *State v. Kang*, 2001 WL 1729126, at *7 (Del. Super. Nov. 30, 2001).

[34] *Diggs v. State*, 257 A.3d 993, 1004 (Del. 2021) (quoting 11 *Del. C* § 1901).

[35] *Dunaway v. New York*, 442 U.S. 200, 212 (1979); *Hayes v. Florida*, 470 U.S. 811, 815–16 (1985).

[36] 442 U.S. at 212.

[t]he mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, *see* [*Cupp v. Murphy*, 412 U.S. 291 (1973)], obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny.[37]

Therefore, the *Dunaway* court held that the "police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation."[38]

In *Hayes v. Florida*, the police were investigating a series of burglary-rapes and "found latent fingerprints on the door-knob" of a victim's bedroom.[39] Even though "they had little specific information to tie petitioner Hayes to the crime," the police "came to consider petitioner a principal suspect" and transported him from his home "to the station for fingerprinting."[40] The United States Supreme Court held that the line between a *Terry* stop and an arrest "is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."[41] The *Hayes* court reasoned that "such seizures, at least where not under judicial

---

[37] *Id*. "Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 213.

[38] *Dunaway*, 442 U.S. at 216.

[39] 470 U.S. at 812.

[40] *Id.* at 812, 814 (determining that "there was no probable cause to arrest, no consent to the journey to the police station, and no judicial authorization for such a detention for fingerprinting purposes").

[41] *Id.* at 816.

supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause[,]" and it determined that Hayes' transport to the police station without probable cause was unconstitutional.[42]

Swanson's transport was similarly indistinguishable from a traditional arrest. The officers never informed Swanson that he was being transported solely for the purpose of DNA testing. After finding the firearm at the scene, the officers handcuffed Swanson, placed him in the back of their police vehicle and transported him to the police station. They then questioned him in the turnkey area of the station after Swanson voluntarily spoke with them. This all occurred before Swanson consented to DNA testing. Even though the officers did not arrest Swanson at the scene, Swanson's treatment was consistent with a formal arrest.[43] In fact, at oral argument, the State was unable to explain "how the detention of Mr. Swanson, from the point where the firearm was found in the bin to the time he was swabbed for DNA, is different than an arrest."[44]

---

[42] *Id.* at 814–15, 816.

[43] *See Dunaway*, 442 U.S. at 212 ("The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law.").

[44] Oral Argument at 24:40–25:40, (September 24, 2025), https://courts.delaware.gov/supreme/oralarguments/.

> [THE COURT]: Could you explain to me how the detention of Mr. Swanson, from the point where the firearm was found in the bin to the time he was swabbed for DNA, is different than an arrest?
>
> [THE STATE]: I don't, I think the–no, your Honor, I don't know that I can. I don't know that I can factually distinguish that other than the officer's decision that at that time he was not intending to charge [Swanson]. Whether that is a substantive difference or whether that, regardless, converts this to a *de facto* arrest, I can see your Honor's point.

Nevertheless, the State argues that Swanson's transport did not exceed the scope of a *Terry* stop because "there is no absolute bar against transport" and the transport "was necessary because police could not test Swanson's DNA on the street."[45] Delaware courts have recognized that "[i]n limited circumstances, the police may transport a suspect from one location to another without probable cause as part of an investigatory detention when the transportation is reasonable and necessary."[46] However, "the Delaware rule remains that an investigatory detention must be minimally intrusive and reasonably related in scope to the circumstances which justify the interference."[47] In the context of a transport, Delaware courts have generally found this balancing test to be met only where the transport is sufficiently less intrusive than an arrest and for the purpose of collecting evidence that faces a danger of disappearing if the testing is delayed such as a suspect's blood alcohol content or an eyewitness's memory.[48]

---

*Id.*

[45] Answering Br. on Appeal of Pl.-Below/Appellee at 22, 24 [hereinafter Answering Br.].

[46] *Kang*, 2001 WL 1729126, at *7 (stating that "the police may remove a suspect from the scene of the initial stop without transforming the detention into an arrest when it is reasonably necessary for security reasons or when it is known that a crime has been committed and the police transport a suspect for a 'show-up'"); *see also Hicks*, 631 A.2d at 11 (noting that "in isolated cases the police may move a suspect without exceeding the bounds of a legitimate investigative detention[]"). We note that the State claims that in *Delvalle* "[t]his Court concluded it was lawful for officers to take Delvalle to the police station for fingerprinting under the circumstances" where the officers only possessed reasonable articulable suspicion. Answering Br. at 23 (citing *Delvalle v. State*, 2013 WL 4858986, at *2 (Del. Sept. 10, 2013) (ORDER)). However, the defendant in *Delvalle* did not argue that the transport exceeded the scope of a *Terry* stop. The *Delvalle* court's holding solely focused on "whether the Officers had a reasonable articulable suspicion throughout the whole of the 'investigatory stop.'" *Delvalle*, 2013 WL 4858986, at *2.

[47] *Hicks*, 631 A.2d at 11.

[48] *See State v. Matthews*, 2018 WL 4063481, at *2 (Del. Super. Aug. 27, 2018) (ORDER) (determining "that the transportation of Mr. Matthews to the police station was reasonable and necessary given the weather conditions, and that the additional intrusion of transporting Mr.

14

For example, in *State v. Kang*, the officer determined that the transportation of Kang, who was suspected of driving while under the influence of alcohol, from the scene of a fatal car accident to a hospital to perform field sobriety tests was reasonable and necessary because the conditions at the scene of a fatal automobile accident were not suitable for a sobriety test.[49] The Superior Court found that the officer's determination was supported by "objective and reasonable factors" and therefore determined that the transportation of Kang to a hospital "did not convert the investigatory detention into an arrest" under the circumstances.[50]

In *State v. Biddle*, the "police drove the [suspect] back to the scene of the crime merely for the purpose of a show-up[,]" and after the victim was unable to identify the suspect, the police transported the suspect to police "headquarters for the purpose of

---

Matthews to a location only four blocks away was narrowly tailored to the officer's goal of investigating a possible DUI"); *Kang*, 2001 WL 1729126, at *8 (determining "that the transportation of Mr. Kang to the hospital to administer field sobriety tests did not convert the investigatory detention into an arrest"); *State v. Biddle*, 1996 WL 527323, at *11 (Del. Super. Aug. 9, 1996) (determining that the "brief trip to the crime scene for the limited purpose of a show-up was fully justified and reasonable under the circumstances"), *aff'd*, 712 A.2d 475, 1998 WL 379242 (Del. Jun. 5, 1998) (ORDER); *but see Hicks*, 631 A.2d at 12 (determining "that any balancing of the government's need to search against the type of invasion of the person, which this search entails, militates against finding that the search was justified" where the officer removed a pouch from the suspect and transported him away from the scene to search the pouch); *State v. Maxwell*, 1996 WL 658993, at *2 (Del. Super. Aug. 30, 1996) (concluding that because "[t]his stop occurred in the driveway of the defendant's home, not on the side of an unsafe road, [] the Court is not convinced that the removal of the defendant was the only reasonable and necessary option available to the officer to effectively continue his investigation.").

[49] 2001 WL 1729126, at *8 (finding the conditions not suitable "due to a slight incline in the roadway, darkness, the presence of a crowd of people that had arrived at the scene, and Mr. Kang's fragile emotional state after the death of his passenger and the presence of the body at the accident scene").

[50] *Id*.

15

obtaining inked impressions of the defendant's fingerprints."[51] The Superior Court analyzed the two transports in *Biddle* separately. When analyzing whether the first transport was reasonable and necessary, the Superior Court noted that "the police knew that a crime had been committed but moments before the stop[,]" "[t]he victim felt that she might be able to identify the perpetrator[,]" and "the distance between the scene of the crime and where the defendant was stopped was only one-third or one-quarter of a mile apart."[52]

The Superior Court found that "the transporting of the defendant to the scene of the robbery within moments of its occurrence for the sole purpose of a show-up was, under these facts, minimally intrusive and reasonably related in scope to the circumstances justifying the interference."[53] The *Biddle* court did not consider whether the second transport to the police station for fingerprinting similarly did not exceed the scope of a *Terry* stop, but, instead, found that the transport was independently permissible because "the defendant voluntarily consented to being transported to police headquarters for the purpose of providing a set of his fingerprints."[54]

The State argues that Swanson's transport was necessary—and, therefore, similarly within the scope of a *Terry* stop—because DNA test kits are stored at the police station so the officers could not test Swanson's DNA on the street. Yet the State does not present

---

[51] 1996 WL 527323, at *4, 6.

[52] *Id.* at *6.

[53] *Id.*

[54] *Id.* at *18 (focusing the analysis on whether the consent was coerced).

16

any reason why the DNA test had to be completed immediately as part of the investigatory detention. The United States Supreme Court has noted that "[d]etentions for the sole purpose of obtaining fingerprints" do not need to "come unexpectedly or at an inconvenient time" because "there is no danger of destruction of fingerprints[.]"[55] DNA test results similarly do not face a danger of destruction like a suspect's blood alcohol content and an eyewitness's memory. The legitimate law enforcement interests for DNA testing could still be met by a DNA test completed later once the officers establish probable cause for a search warrant. Therefore, the transport was not the least intrusive means available to the officers.

Additionally, Swanson clearly did not consent to the transport for the purposes of a DNA test. The DNA test was not discussed until Swanson, while in the turnkey area of the police station, offered to consent to have his DNA taken.[56] Swanson's handcuffed

---

[55] *Davis v. Mississippi*, 394 U.S. 721, 727–28 (1969). The Court in *Davis* found it unnecessary to address the validity of "narrowly circumscribed procedures for obtaining" the fingerprints of suspects without probable cause, in part, because the "petitioner was not merely fingerprinted during the . . . detention," but also, had been subjected to interrogation. *Id.* at 728. As a result, the detention violated the Fourth Amendment. The Court did acknowledge the possibility that the Fourth Amendment might permit a narrowly circumscribed procedure for fingerprinting detentions on less than probable cause. *Id.* at 727; *see also Hayes*, 470 U.S. at 817. We note that latent prints at a scene do face a danger of destruction. *Pierce v. State*, 270 A.3d 219, 226 (Del. 2022) (noting that "latent prints are fragile and are subject to environmental conditions"). However, a suspect's fingerprints, which can be captured through inked impressions, generally do not face the same danger of destruction. *Davis*, 394 U.S. at 727.

[56] A84 (Motion to Suppress Hearing at 40):

> Q: Instead of continuing to play the minute or so [of State's Exhibit 1 *i.e.*, Detective Lerro's body camera footage in the turnkey area at the police station], does the Defendant consent to giving his DNA?
>
> A: He does.
>
> Q: And did he do that prior to you even saying anything about DNA in this case?

17

transport to the police station constitutes a significant deprivation of liberty consistent with an arrest that cannot be justified by the purposes of the initial detention—searching him and the surrounding area for a firearm. Accordingly, Swanson's transport exceeded the permissible scope of a *Terry* stop and constituted a *de facto* arrest which required probable cause.

### B. Justifications for the Terry Stop and Arrest

Having concluded that Swanson's initial detention was a *Terry* stop and his subsequent transfer to the police station was an arrest, we next examine the facts known to the officers at the time of each intrusion to determine whether the required level of suspicion was present to justify each type of seizure.

### 1. The Terry Stop Was Supported By Reasonable Articulable Suspicion

"[L]aw enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual to be detained is committing, has committed, or is about to commit a crime."[57] "Reasonable and articulable suspicion is a less stringent standard than the probable cause standard and requires a quantum of proof that is less than preponderance of the evidence."[58] "In determining whether there was reasonable suspicion to justify a detention, the court

---

A: Yes.

[57] *Register*, 337 A.3d at 1234 (quoting *Woody v. State*, 765 A.2d 1257, 1262 (Del. 2001)).
[58] *Purnell v. State*, 832 A.2d 714, 719 (Del. 2003).

defers to the experience and training of law enforcement officers."[59]  "[T]he officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"[60]  Accordingly, we must evaluate "the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[61]  Courts must also determine "when the stop actually took place" because only facts known to the officer at the time of the stop can be considered.[62]

The parties do not contest that the initial stop occurred when Investigator Linkhurst conducted a pat down of Swanson.  At the time of the pat down, the following facts were known to the officers: (i) Swanson was a person prohibited; (ii) Detective Lerro believed he saw, in an Instagram video, Swanson miming the shooting of a gun with his hands and lifting his sweatshirt to reveal a magazine or firearm in his waistband; (iii) the CI texted Detective Lerro a screen recording of the Instagram video and stated that Swanson was in possession of a firearm; (iv) the CI texted Detective Lerro again—after observing Swanson in person—confirming that Swanson was still in possession of a firearm, was located in the area of 23rd and Jessup Street, and was wearing a white bucket hat, a black hoodie with Rick and Morty symbols, and ripped jeans; (v) the officers heard a "call out" as they

---

[59] *Murray*, 213 A.3d 571, 579 (Del. 2019) (quoting *Flowers*, 195 A.3d at 27).

[60] *Id.* (quoting *Terry*, 392 U.S. at 21).

[61] *Flowers*, 195 A.3d at 27 (quoting *Bryant v. State*, 156 A.3d 696, 2017 WL 568345, at *1 n.1 (Del. Feb. 8, 2017) (ORDER)).

[62] *Id.* at 26; *see also Terry*, 392 U.S. at 21–22.

approached the scene; and (vi) the officers confirmed, upon arrival at the scene, that both Swanson—wearing the same clothes described by the CI—and the CI were located in the area.[63]

The State argues that Detective Lerro's belief that he saw a firearm in the Instagram video should be considered in the totality of the circumstances because "the Superior Court found [] [Detective Lerro]'s testimony on this point credible[.]"[64]  Findings on credibility determinations, are subject to the clearly erroneous standard.[65]  Here, the Superior Court found that "[Detective Lerro] testified credibly at the Suppression Hearing that he saw the gun" on Swanson's waist in the video even though the trial court also stated that "despite its best efforts [it was] unable to make out a firearm (or any part of a firearm)" in the same video.[66]  The Superior Court resolved this conflict by stating that "the determination of reasonable suspicion is evaluated based on the totality of the circumstances viewed through the officer's eyes, and not the Court's."[67]  We believe that the pat down was supported by reasonable articulable suspicion even without consideration of Detective Lerro's testimony on this point.

"An informant's tip may provide reasonable suspicion for a stop and seizure where the totality of the circumstances, if corroborated, indicates that the information is

---

[63] *Swanson*, 2023 WL 11876797, at *5–7.

[64] Answering Br. at 12.

[65] *Diggs*, 257 A.3d at 1005.

[66] *Swanson*, 2023 WL 11876797, at *5.

[67] *Id.*

reliable."[68]   "[T]he reasonable suspicion standard 'requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.'"[69]   In determining whether a tip is sufficiently reliable in the totality of the circumstances, "a court must consider the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[70]   "[T]he reliability of an informant is not by itself determinative but is merely one factor to be taken into account under the totality of the circumstances test" in addition to independent police corroboration.[71]

The United States Supreme Court has distinguished between (1) police corroboration regarding a suspect's criminality or future movements and (2) police corroboration regarding a suspect's identity.[72]   Courts are generally more inclined to find

---

[68] *Nickerson v. State*, 186 A.3d 800, 2018 WL 2230741, at *2 (Del. 2018) (ORDER) (quoting *Miller v. State*, 25 A.3d 768, 771 (Del. 2011)).

[69] *Bloomingdale v. State*, 842 A.2d 1212, 1217 (Del. 2004) (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)).

[70] *Nickerson*, 2018 WL 2230741, at *2 (quoting *Brown v. State*, 897 A.2d 748, 751 (Del. 2006)).

[71] *Henry v. State*, 588 A.2d 1142, 1991 WL 12094, at *2–3 (Del. 1991) (ORDER) (stating that the officer who received the tip knew the informant and "could use this knowledge in considering whether the information supplied about [the suspect] was apt to be credible and whether the informant was likely to be in a position to receive confidential information about [the suspect's] activities[]"); *Valentine v. State*, 207 A.3d 566, 572 (Del. 2019) (finding a tip insufficiently reliable even though the officers referred to the informant as past proven reliable where the affidavit "said nothing about the manner in which the informant had proved to be reliable in the past (*e.g.*, investigation of prior tips corroborated their accuracy or led to convictions)[]"); *Cooper v. State* (*Cooper I*), 32 A.3d 988, 2011 WL 6039613, at *5 (Del. 2011) (ORDER) ("While the reliability of the informant is one factor, tips from a first-time or anonymous informant may still provide probable cause for an arrest[]" if the tip is sufficiently corroborated even where nothing is known about the informant's credibility.).

[72] *See, e.g.*, *Florida v. J.L.*, 529 U.S. at 272.

the former to enhance the reliability of an anonymous tip to the level required for a finding of reasonable suspicion.[73] However, courts have also found it reasonable for an officer, in finding reasonable articulable suspicion, to rely on a tip from an informant after corroborating the suspect's identity and behaviors of the suspect predicted by the informant.[74] Where the informant's identity is known to the police, the informant's "reputation can be assessed" and the informant "can be held responsible if her allegations turn out to be fabricated[.]"[75]

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.*

[73] *See Florida v. J.L.*, 529 U.S. at 272, 274 (finding a tip not sufficiently corroborated where police were able to "verify the pertinent details of the tip except the existence of the firearm"); *LeGrande v. State*, 947 A.2d 1103, 1111 (Del. 2008) (because there was no corroboration by independent police work of the anonymous tipster's assertion of illegality, probable cause was lacking); *but see Bloomingdale*, 842 A.2d at 1219–22 (finding corroboration of identification sufficient where the alleged criminal act concerned erratic driving rather than "a concealed, possessory offense" because an anonymous "tip about readily observable evidence of criminal activity, such as erratic driving, is inherently more reliable than a tip about concealed criminal activity").

[74] *See Adams v. Williams*, 407 U.S. 143, 147–48 (1972) (concluding that the police sufficiently corroborated the informant's assertions by matching the description of the car and observing the behaviors that the informant predicted); *Miller*, 25 A.3d at 773–74 (observing that "[t]he informant's ability to predict specific future behavior of the subjects demonstrated his knowledge of inside information and illegal criminal activities[]"); *Purnell*, 832 A.2d at 720 (finding that the tip was sufficiently corroborated given that the suspect "matched the description provided by the informant and was in the vicinity stated by the informant"); *see also Diggs*, 257 A.3d at 1007 (finding that "Patrolman Shupe's later observations, coupled with the tip and the minimal corroboration of it, create[d] a reasonable suspicion of criminal activity[]").

[75] *Florida v. J.L.*, 529 U.S. at 270.

In *Adams v. Williams*, Sgt. Connolly was "on car patrol duty in a high-crime area" when "a person known to Sgt. Connolly approached his cruiser and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist."[76] "The informant was known to [Sgt. Connolly] personally and had provided him with information in the past."[77] The United States Supreme Court concluded, based on the informant's known credibility and the fact that "the informant [] came forward personally to give information that was immediately verifiable at the scene[,]" that the tip "carried enough indicia of reliability to justify the officer's forcible stop of Williams."[78] In this case, the United States Supreme Court determined that the tip was reliable enough for Sgt. Connolly to have reasonable articulable suspicion after he observed the suspect "sitting alone in a car in a high-crime area" and identified the vehicle as the one described in the tip even before confirming any aspects of the suspect's criminality.[79]

In *Miller v. State*, "the informant told Detective Popp that two black males, one lighter in complexion than the other, would arrive at a specific parking lot between 11:00

---

[76] 407 U.S. at 144–45.

[77] *Id*. at 146.

[78] *Id.* at 146–47 (stating that "[t]his is a stronger case than obtains in the case of an anonymous telephone tip[]" because the tip came from a known informant who has previously provided information). We agree with the Supreme Court's further observation that "[i]nformants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability[,]" and that "[o]ne simple rule will not cover every situation." *Id.* at 147.

[79] *Id.* The Court found that the tip could support probable cause "to arrest Williams for unlawful possession of the weapon" once "the policeman found Williams in possession of a gun in precisely the place predicted by the informant." *Id.* at 148. The Court noted that "[t]his tended to corroborate the reliability of the informant's further report of narcotics and, together with the surrounding circumstances, certainly suggested no lawful explanation for possession of the gun." *Id.* at 148–49.

a.m. and 1:00 p.m. to deliver bundles of heroin[]" and "that when they arrived, they would back into one of four specific parking spots."[80] Because the "informant made contact with Detective Popp on multiple occasions, and even made contact with the police contemporaneous to the investigatory operation[,]" this Court determined that "the informant was more than an anonymous tipster."[81] Therefore, we concluded that "the informant's tip was more reliable than the information of a one-time anonymous caller[]" and held that corroboration of only the time, method, and destination of delivery predicted by the informant was sufficient to support the tip for the purpose of reasonable articulable suspicion.[82]

And in *Purnell v. State*, "the police received a tip from a confidential informant who had supplied reliable information in the past[]" that "two black males were standing on the corner of Fourth and Delamore Streets in Wilmington[,]" "were in possession of narcotics and handguns[,]" and were wearing specific outfits.[83] This Court held that corroboration of the suspect's description, location, and outfit was sufficient to support the tip for the purpose of reasonable articulable suspicion because "[t]he informant in Purnell's case was

---

[80] *Miller*, 25 A.3d at 773.

[81] *Id.* at 773 (stating that this behavior "suggests some sort of familiarity between the police and the informant").

[82] *Id.* at 773–74 (finding that "the informant accurately predicted the specific actions of Miller" where "the informant accurately predicted the time (11:00 a.m.-1:00p.m.), the method (would arrive in a vehicle and back into one of four parking spots), and the destination of the delivery (Town Court Compton Townhouses)."). "The informant's ability to predict specific future behavior of the subjects demonstrated his knowledge of inside information and illegal criminal activities." *Id.*

[83] 832 A.2d at 716–17.

known to the police as a source of reliable information."[84]  Furthermore, "the informant gave a detailed description of what each of the males was wearing and the activity they were engaging in."[85]  Our Court concluded that "[c]onsidering the totality of the circumstances, the officers did possess reasonable articulable suspicion to stop Purnell, given that he matched the description provided by the informant and was in the vicinity stated by the informant."[86]

This CI is similarly known to be a source of reliable information.  Detective Lerro knew the CI personally and the CI is past proven reliable.  In fact, the CI previously provided Detective Lerro with information which led to five separate arrests.  In addition, the CI had never provided Detective Lerro with information that later turned out to be inaccurate.  Even still, when Detective Lerro—acting on the tip that Swanson was in possession of a firearm at 23rd and Jessup wearing a specific outfit—arrived at the scene, he verified that Swanson was wearing the outfit described by the informant and was located in the area described by the informant.  This occurred prior to Swanson being patted down for a firearm.  Further, everything the officers observed at the scene was consistent with the informant's tip.  In these circumstances, we conclude that Swanson's initial detention was supported by reasonable articulable suspicion.

---

[84] *Id.* at 720.

[85] *Id.*

[86] *Id.*

## 2. *The Arrest Was Not Supported By Probable Cause*

Swanson first argues that the State abandoned the probable cause issue because the prosecutor merely asserted that there was probable cause but "never followed up with a legal argument."[87] "Rule 8 provides that 'only questions fairly presented to the trial court may be presented for review.'"[88] At the Motion to Suppress Hearing, the State's primary position was that (1) "there was reasonable suspicion to stop and detain Mr. Swanson" and (2) the transport was permissible under 11 *Del. C.* § 1902 because it was "reasonable and necessary and tied to [the police's] investigation of [Swanson]."[89] However, the State also asserted that it "by no means abandoned being able to argue probable cause" and argued that the officers had probable cause to arrest Swanson at the time that the officers found a firearm 20 feet away from Swanson.[90] Even though the Superior Court did not address probable cause because it found that reasonable articulable suspicion sufficiently justified both the stop and transport, the issue of probable cause was fairly presented to the trial court.

An arrest "requires 'probable cause that the suspect has committed a crime.'"[91] "Probable cause exists where the facts and circumstances within the arresting officer's

---

[87] Reply Br. On Appeal of Def.-Below/Appellant at 7.

[88] *Protech Mins., Inc. v. Dugout Team, LLC*, 284 A.3d 369, 377 (Del. 2022) (citing Supr. Ct. R. 8).

[89] A109 (Motion to Suppress Hearing at 65).

[90] A109, 117 (Motion to Suppress Hearing at 65, 73).

[91] *Flowers*, 195 A.3d at 25 (quoting *Quarles*, 696 A.2d at 1337); *see also Jarvis v. State*, 600 A.2d 38, 42 (Del. 1991) ("While reasonable suspicion will support a limited search and seizure, it does not justify an arrest. Only probable cause provides the police the authority to intrude into an individual's privacy to that extent." (citing 11 *Del. C.* § 1904(b)(1); *Thompson v. State*, 539 A.2d 1052 (Del. 1988))).

knowledge, of which he has trustworthy information, are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed" by the suspect.[92] "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."[93]

In comparing the evidence required for reasonable articulable suspicion and probable cause, the United States Supreme Court has noted that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.[94]

We have stated that "[r]easonable articulable suspicion is 'considerably less than proof by a preponderance of the evidence and less demanding than probable cause.'"[95] Accordingly, in certain circumstances tips can carry "enough indicia of reliability to justify" a *Terry* stop even where the tip cannot justify an arrest.[96] That is the case here.

---

[92] *Stafford v. State*, 59 A.3d 1223, 1229 (Del. 2012).

[93] *Id. (*quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Juliano*, 260 A.3d at 629 (stating that, "the facts and circumstances that justify the belief that a crime has been committed such that a warrantless arrest is authorized must be 'within [the] arresting officer's knowledge and of which they had reasonable trustworthy information[,]" and that, "though the test is objective, it focuses on the facts known to the officer at the time of the challenged arrest").

[94] *Alabama v. White*, 496 U.S. 325, 330–31 (1990); *see also Robertson v. State*, 596 A.2d 1345, 1352 (Del. 1991).

[95] *Register*, 337 A.3d at 1234 (quoting *Diggs*, 257 A.3d at 1004).

[96] *Adams*, 407 U.S. at 147 (finding that "the information carried enough indicia of reliability to justify the officer's forcible stop of Williams[]" even though the "informant's unverified tip may

"An informant's tip may provide probable cause for a warrantless arrest where the totality of the circumstances, if corroborated, indicates that the information is reliable[]" in its assertion of illegality.[97] Courts use the same totality of the circumstances balancing approach that "applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established."[98] "In measuring the totality of the circumstances when an informant's tip is involved, this Court considers 'the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[99] Since probable cause requires a higher standard of reliability than reasonable articulable suspicion, this Court has generally found a tip to be sufficiently reliable to meet this higher standard only where the police corroborate aspects of the tip relating to the alleged criminal act even if the informant's identity is known.[100]

---

have been insufficient for a narcotics arrest or search warrant[.]"); *see also Robertson*, 596 A.2d at 1352 (holding that "the quantum of evidence necessary for reasonable suspicion is less than that required for probable cause").

[97] *Cooper I*, 2011 WL 6039613, at *5 (quoting *Brown*, 897 A.2d at 751); *see also McKinney v. State*, 107 A.3d 1045, 1046 (Del. 2014) (citing *LeGrande*, 947 A.2d at 1111) ("In this Opinion, we reaffirm our holding in *Le[G]rande v. State* that a confidential informant's tip must be reliable in its assertion of illegality, not merely in its tendency to identify a determinate person.").

[98] *Alabama*, 496 U.S. at 330–31.

[99] *Cooper v. State* (*Cooper II*), 228 A.3d 399, 405 (Del. 2020) (citing *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013) (en banc)); *see also Valentine*, 207 A.3d at 572 (stating "that the assessment of informants' tips must take into account the reliability or veracity of the informant, the basis of the informant's knowledge, and 'degree to which the tip is corroborated by independent police surveillance and information'" (quoting *LeGrand v. State*, 947 A.2d at 1108)).

[100] *See Cooper II*, 228 A.3d at 401–2, 405 (Del. 2020) (finding sufficient corroboration of past proven reliable informant's tip that "Cooper was a large scale heroin dealer" where informant "was able to complete a controlled purchase of drugs and a weapon from Cooper under police surveillance"); *Holden*, 60 A.3d at 1116 (finding sufficient corroboration where past proven reliable informant alleged that the suspect was selling drugs at his house and officers found

Corroboration regarding a suspect's identity, alone, usually does not increase a tip's reliability enough to support probable cause.[101] In *LeGrande v. State*, "a probation officer received a tip from one of his probationers that LeGrande, who was also on probation, possessed certain weapons and marijuana in his apartment."[102] This Court found that police corroboration of "the accused's identity, the location of his locked apartment, his probationary status, and that his neighbor was wanted[]" was not sufficient to support a determination of probable cause.[103] We noted that "[c]onfirmations of these facts, which could be used to identify LeGrande, '[did] not show that the tipster [had] knowledge of concealed criminal activity.'"[104] Ultimately, this Court determined that the totality of the

---

"oxycodone without a prescription on a person who made a brief visit to the house and then dissembled about the location he had just left"); *Brown*, 897 A.2d at 750–51 (finding sufficient corroboration where a known informant stated that suspect "would soon attempt to sell items similar to those stolen from her home at a nearby store, named the Closet[]" when police independently observed "Brown approaching the Closet at the time reported in the tip[]"); *Darling v. State*, 847 A.2d 1121, 2004 WL 1058363, at *1 (Del. 2004) (ORDER) (finding sufficient corroboration where past proven reliable informant alleged that a suspect was "selling crack cocaine[,]" and officers identified "three males standing next to a vehicle fitting the informant's description" in "a well-known drug area" and observed the three males flee the scene after the officers identified themselves); *King v. State*, 633 A.2d 370, 1993 WL 445484, at *1–2 (Del. Nov. 1, 1993) (ORDER) (finding sufficient corroboration where past proven reliable informant alleged that suspect was in possession of a large amount of crack cocaine and the officers identified the suspect in an "area [that] was known by police as 'an open air drug market' where several arrests had been made in the past"); *Bailey v. State*, 440 A.2d 997, 1000 (Del. 1982) (finding a tip to be sufficiently corroborated where a known informant told the officer of the occurrence and location of a shooting and the police officer "confirmed the information by finding the victim's body at the location described by [the informant]").

[101] *See LeGrande*, 947 A.2d at 1111 (finding corroboration insufficient where corroboration only pertained to identification of the suspect); *see also McKinney*, 107 A.3d at 1049 (finding corroboration insufficient where police "corroborated the accused's identity but failed to corroborate the CI's knowledge of concealed criminal activity").

[102] 947 A.2d at 1105.

[103] *Id.* at 1111.

[104] *Id.*

29

circumstances did not support a finding of probable cause in that case because "there was no corroboration by independent police work of the anonymous tipster's assertion of illegality[.]"[105]

The officers' corroboration was similarly insufficient here. At the time the officers arrested Swanson, they had only confirmed details in the CI tip relating to identification, such as Swanson's outfit and location, rather than any details in the tip about the alleged criminal act. And the officers did not find any independent evidence suggesting that Swanson possessed a firearm. The State argues that the officers' discovery of the firearm corroborated the CI's statement that Swanson was in possession of a firearm.[106] However, the discovery of a firearm in a recycling bin 25 to 30 feet away from Swanson was not sufficient to corroborate the information in the tip.

The officers were unable to confirm that the firearm they found was the same firearm that was mentioned in the tip. For example, the tip did not include any details about the firearm such as the model, make, manufacturer or the color. And the tip did not include the CI's vantage point or state how Swanson was handling the firearm (*i.e.*, whether he held it on his person or stored it nearby). In fact, the tip did not contain any information

---

[105] *Id.*; *see also McKinney*, 107 A.3d at 1049 (finding a tip insufficient to support probable cause where the police "corroborated the accused's identity but failed to corroborate the CI's knowledge of concealed criminal activity[]").

[106] *See* Oral Argument at 25:40–26:40, (September 24, 2025), https://courts.delaware.gov/supreme/oralarguments/; Answering Br. at 25 (arguing that "[t]his Court has often found tips provided by past proven reliable informants which are then corroborated by officers [to] establish probable cause").

about the criminal act that could be confirmed once the pat down revealed no firearm on Swanson's person.

Further, the police did not discover any independent evidence linking the firearm to Swanson before they arrested him. For example, the record contains no evidence that any officers saw Swanson walking toward or away from that recycling bin. Even if we considered Detective Lerro's observations of the Instagram video in the totality of the circumstances, his observations, which were inconsistent with what the trial court's careful review of the video disclosed, also did not provide any details that could connect Swanson to the firearm found at the scene. Detective Lerro merely stated that he saw a magazine or firearm in Swanson's waistband. Since he did not identify any specific features of the object he saw, he was unable to identify the firearm as the object in the Instagram video. Where the existence of the criminal offense hinges on whether Swanson, a person prohibited, possessed a firearm, the mere discovery of a firearm in these circumstances does not transform the officers' reasonable articulable suspicion into a likelihood that Swanson was engaged in criminal activity. For these reasons, Swanson's *de facto* arrest was not supported by probable cause, and the evidence flowing therefrom must be excluded.[107]

Because we reverse on the basis set forth above, we do not need to address whether the Superior Court failed to make a sufficient inquiry into potential juror bias.

---

[107] *See Register*, 337 A.3d at 1233–34 ("Under the exclusionary rule, evidence obtained by searches and seizures that violate [constitutional] guarantees is inadmissible." (quoting *Diggs*, 257 A.3d at 1003)).

## *V. CONCLUSION*

For the foregoing reasons, we hold that the Superior Court erred in denying Swanson's Motion to Suppress because the transport constituted a *de facto* arrest unsupported by probable cause. Therefore, we **REVERSE** the judgment of the Superior Court.